**United States District Court**
For the Northern District of California

1

2

3

4

5   IN THE UNITED STATES DISTRICT COURT

6   FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   DAPHNE RAND,                                    No. C 09-639 SI

9            Plaintiff,                             **ORDER RE: CROSS-MOTIONS FOR
                                                    PARTIAL SUMMARY JUDGMENT**
10     v.

11   AMERICAN NATIONAL INSURANCE
     COMPANY,
12
             Defendant.
13   _____/

14

15          On September 10, 2010, the Court held a hearing on the parties' cross-motions for partial

16   summary judgment.  For the reasons set forth below, the parties' motions are GRANTED in part and

17   DENIED in part.

18

19                                       **BACKGROUND**

20          Plaintiff Daphne Rand, by and through Debra Dolch, as conservator of her person and estate,

21   filed this class action against defendant American National Insurance Company ("ANICO") alleging

22   that defendant used unfair, deceptive and unlawful sales practices in marketing its deferred annuity

23   products to senior citizens in California.[1]  An annuity is a contract between an insurance company and

24   the annuitant.  The annuitant makes payments, either in installments or in one lump-sum, to the

25   insurance company.  Compl. ¶¶ 16-17.  A deferred annuity postpones payment to the annuitant until

26   _____

27          [1] After this lawsuit was filed, Ms. Rand died.  In an order filed June 22, 2010, the Court granted
     a motion to substitute Ms. Dolch, as a Special Administrator of the Estate of Daphne R. Rand, as
28   successor-in-interest to plaintiff Daphne R. Rand.  This order refers to Ms. Dolch as "plaintiff," and Ms.
     Rand as "Rand."

1   some agreed upon point in the future.  During the deferment period, the principal gains interest, but there

2   is a penalty for withdrawing the money early.  *Id.* ¶¶ 17, 19.

3          Rand was 86 years old when she purchased two separate ANICO Benchmark Reliance annuities.

4   The annuities offered Rand an investment with a guaranteed principal for twenty years, plus tax-deferred

5   compounded interest at a fixed rate of return.  Corrected Eaken Decl. Ex. 1 at ANICO-RAND 073620,

6   Ex. 2 at ANICO-RAND 073669.  Upon purchase of the annuities, Rand could withdraw up to 10% of

7   the principal annually without incurring a "surrender charge."  *Id.* at Ex. 1 at ANICO-RAND 073619,

8   Ex. 2 at ANICO-RAND 073669.  The complaint alleges that under the terms of both policies, "[the

9   policies] would not mature until 2025, meaning that Ms. Rand would not receive *any* payments on the

10  annuiti[es] until she was *106 years old*, and if she attempted to surrender the polic[ies] before she turned

11  96, she would have to pay surrender charges as high as 12% for the first year, declining by 9% for the

12  next nine years."  Compl. ¶¶ 40, 41 (emphasis in original).

13         The Benchmark Alliance annuities sold to Rand were developed by Legacy Marketing Group

14  in conjunction with ANICO.  Friedman Decl. Ex. C (Hemme Depo. at 19:21-21:23).  Legacy has an

15  exclusive marketing agreement with ANICO to market and sell all Benchmark annuities through

16  Legacy's wholesalers (marketing organizations) and producers (sales agents).  Friedman Decl. Ex. D

17  (Eaken Depo. at 15:15-22, 16:20-17:5).

18         On February 18, 2005, Rand purchased Policy No. LAR0073387, for which she paid a $50,000

19  premium.  Pavelka Decl. ¶ 2.  For this policy, Rand selected the Index Corporate Bond Strategy Cash

20  Value Strategy.  *Id.*  ANICO's Vice President of Life Policy Administration, Bruce Pavelka, states that

21  "Because of this Cash Value Strategy selection, a Market Value Adjustment[2] ("MVA") would be

22  applied if more than the ten percent Surrender Charge Free withdrawal was accessed during the

23  Surrender Charge period."  *Id.*  On September 29, 2008, Rand's conservator, Debra Dolch, withdrew

24  $5,620.00.  *Id.* ¶ 3.  Because this amount was within the ten percent Surrender Charge Free withdrawal

25  amount, no surrender charges were assessed and the MVA was not applied.  *Id.*  On February 11, 2009,

26  Dolch surrendered the policy.  *Id.* ¶ 4.  At the time of the surrender, the gross cash value was

27

28         [2]  The "Market Value Adjustment" is discussed in greater detail *infra*.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

$51,132.51. *Id.* Because the policy was within the surrender period and the amount requested was over the ten percent free withdrawal amount, a surrender charge of $4,621.58 was assessed. *Id.* In addition, the MVA was applied, resulting in an additional payment of $218.36, with a total payment to Dolch of $46,729.29 upon surrender. *Id.* As discussed *infra*, the MVA includes a 50 basis point "bias," which reduced the amount of the additional payment to Dolch; if it were not for the 50 basis point "bias," Dolch would have received a greater payment upon surrender.

On October 3, 2005, Rand purchased another annuity, Policy No. LAR0074360. This policy involved the replacement of two existing annuities that Rand had purchased from another insurer, Allianz Insurance Company. *Id.* ¶ 5. Rand paid a premium of $354,699.46, which was funded by surrendering the Allianz annuities. *Id.* Over the duration of the annuity, a number of withdrawals were made by both Rand and Dolch, and eventually upon Rand's death, a death benefit was paid to Rand's beneficiary, the Jehovah's Witnesses. *Id.* In total, $370,255.80 was paid to Rand, Dolch, and the Jehovah's Witnesses. *Id.* When Rand died, the proceeds of her annuities were reduced by a 9% death-related surrender charge. Plaintiff's Reply at 14:15-16.

Count 1 of the complaint alleges that ANICO violated California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200 *et seq.*, by not properly disclosing all of the material facts and risks associated with the purchase of a deferred annuity, failing to conduct itself with persons over 65 in good faith, and issuing or approving advertising that was deceptive or misleading to persons over 65. Compl. ¶¶ 65-71. The complaint alleges that ANICO violated the UCL by, *inter alia*, failing to comply with the disclosure obligations contained in California Insurance Code Sections 10127.13, 10127.10, 10509 and 789. The parties have filed cross-motions for partial summary judgment on the question of whether ANICO complied with these Insurance Code sections.[3]

---

[3] In its opposition to plaintiff's motion, defendant argues, *inter alia*, that plaintiff is not entitled to summary judgment on the UCL claim because plaintiff has not demonstrated causation and/or standing. Specifically, defendant argues that plaintiff has not shown that the claimed error in locating surrender charge information caused her to be unaware of the surrender charges. However, plaintiff's motion for partial summary judgment focuses only on the question of whether ANICO violated the various Insurance Code provisions, and this order is also limited to those questions. The parties shall address standing and causation in connection with the class certification motion or other appropriate motions.

**United States District Court**
For the Northern District of California

**LEGAL STANDARD**

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.     California Insurance Code § 10127.13**

California Insurance Code Section 10127.13, titled "Life insurance and annuity contracts; senior citizens; disclosure of surrender charge period and penalties" provides:

> All individual life insurance policies and individual annuity contracts for senior citizens that contain a surrender charge period shall either disclose the surrender period and all associated penalties in 12-point bold print on the cover sheet of the policy or disclose the location of the surrender information in bold 12-point print on the cover page of the policy, or printed on a sticker that is affixed to the cover page or to the policy jacket. The notice required by this section may appear on a cover sheet that also contains the disclosure required by subdivision (d) of Section 10127.10.

Cal. Ins. Code § 10127.13. The inside policy jackets of both of Rand's policies bore a sticker with the

4

following language:

> AFTER 30 DAYS, CANCELLATION MAY RESULT IN A SUBSTANTIAL PENALTY KNOWN AS A SURRENDER CHARGE.   THIS POLICY HAS SURRENDER CHARGES FOR THE YEARS SHOWN ON THE POLICY'S DATA PAGE.   THE SURRENDER CHARGE FACTORS ARE ALSO SHOWN ON THE POLICY'S DATA PAGE.   YOU MAY ALSO REFER TO THE SURRENDER CHARGE PROVISION IN THE POLICY FOR INFORMATION REGARDING THE SURRENDER CHARGE.

Corrected Eaken Decl. Ex. 1 at ANICO-RAND 002692, Ex. 2 at ANICO-RAND 002552.

Plaintiff contends that the stamp affixed to the ANICO annuities does not comply with Section 10127.13 because (1) ANICO imposes a "Market Value Adjustment" that is functionally the same as a surrender charge, that is neither referenced nor disclosed on the front page of the policy jacket, cover page, or the "data page" referenced in the stamp; (2) ANICO also imposes surrender charges that are not disclosed on the cover page or the "data page" on any death benefit payments when a policyholder dies during the surrender period; and (3) ANICO's stamp is affixed in the wrong location and its language does not disclose the "location" of the surrender information.

### A.      Market Value Adjustment

Plaintiff contends that in addition to the surrender charges listed on the "data page"[4] referenced in the notice (which range from 10% to 2% of the account value), ANICO imposes an additional penalty of 2%-3% of the account value in the form of a MVA whenever a policyholder surrenders her annuity or withdraws more than the allowable 10% penalty-free amount during the 10 year surrender period.[5] The MVA is a formula which is applied to adjust the amount of any withdrawn account values to

---

[4]  The "Data Page" begins on page 2 of the policy and, according to ANICO, continues through page 4. *See* Friedman Decl. Ex. A at ANICO-RAND 073620-073622; Ex. B at ANICO-RAND 073668-073670. Pages 2 and 3 of the policy are titled "Data Page," while page 4 of the policy does not contain the words "Data Page" on it; the surrender charge schedule is listed on page 4. Friedman Decl. Ex. A at ANICO-RAND 073620. As discussed *infra*, the parties dispute whether the location of the surrender charge schedule on page 4 of the policy complies with the Insurance Code.

[5]  ANICO applies a similar formula, called the "Retroactive Interest Adjustment" ("RIA"), when a policyholder selects the "Guaranteed One-Year or "Guaranteed One-Year Current Market" strategies. Hemme Decl. ¶ 6.  As with the MVA, policyholders do not incur an RIA if they withdraw 10% or less of their funds each year during the first ten years of the policy.  *Id.*  If the RIA is applied, the policy receives the minimum interest rate rather than the quoted credited interest rate to the extent that the credited interest rate is above the minimum rate.  The parties' briefing largely focuses on the MVA, not the RIA, and thus the Court's order also focuses on the MVA.

account for changes in interest rates occurring after the date the annuity was issued.  The MVA formula also includes a 50 basis point ("bp") "bias" that reduces the amount paid to the annuity owner upon surrender or withdrawals.

Rex Hemme, ANICO's Rule 30(b)(6) corporate designee on actuarial issues, testified at his deposition that the purpose of the MVA is to adjust the amount paid to the policyholder on withdrawal to reflect changes in values attributable to changes in interest rates, and to share the risk that the company assumes of having to liquidate the bond prematurely.  Friedman Decl. Ex. C (Hemme Depo. at 84:2-17).  ANICO's expert Gary Hernandez explains the MVA as follows:

> In situations where the annuity owner makes a withdrawal in excess of the free withdrawal amount specified in the contract, or terminates the contract, prior to the natural conclusion of the contract, the insurer must make a special calculation of the interest rate applicable to the policy as of the date of that action.  Interest rates are usually set at specific intervals identified in the annuity contract, such as an annual valuation date.  When a contract is subject to out-of-cycle value calculation, using the interest rate in effect on the date of the withdrawal or early termination, the insurer incurs extra expenses.  Commensurately, basis points are applied in that value calculation to recognize this expense.  Depending on the linked-market results, the interest rate applied in determining that accumulated value figure policy may be higher or lower than the rate declared in the last period (the Rand policies were linked to the ten-year Treasury bond rate).

Hernandez Decl. ¶ 22.[6]  Depending on the interest rate fluctuation, the MVA can result in an additional payment to the policyholder, or a deduction.  However, even when the MVA results in an additional payment to the policyholder, the 50 bp bias *always* reduces the amount of the payment to the policyholder.

The MVA is not disclosed as a "surrender charge."  Instead, the MVA is described in a section of the policy titled "Premiums and Cash Value Strategies":

---

[6]  Plaintiff has objected to Mr. Hernandez's declaration on a number of grounds.  The Court OVERRULES plaintiff's objection that defendant did not timely disclose Mr. Hernandez as an expert witness.  Defendant states that it first disclosed Mr. Hernandez on July 12, 2010, and notes that the expert disclosure deadline is November 9, 2010.  Plaintiff also objects to the entirety of Mr. Hernandez's declaration (as well as the declarations of Timothy Pfeifer, Michael Bayless, and Rex Hemme) on the ground that the declarant offers inadmissible legal conclusions.  To the extent Mr. Hernandez or any other declarant offers opinions on the ultimate legal questions presented – such as whether ANICO complied with the Insurance Code by not disclosing the MVA as a "surrender charge" – the Court SUSTAINS plaintiff's objections.  *See, e.g.*, Hernandez Decl. ¶ 21 ("In my opinion, the application of the Market Value Adjustment ('MVA') does not trigger California Senior Citizen Disclosure Requirements because: 1) the MVA is neither a surrender charge nor a penalty . . . .").  This order only addresses the parties' specific evidentiary objections to the extent that the Court cites or relies on the evidence at issue.

### Market Value Adjustment

Upon Access, a Market Value Adjustment will be applied to the Strategy Cash Value of the Index 10-Year Treasury and Index Corporate Bond Strategies if more than the Surrender Charge Free Withdrawal Percentage of the Annuity Cash Value is Accessed during any Policy Year prior to the eleventh Premium Year.

The Market Value Adjustment may be either positive or negative.  The Market Value Adjustment is A * [B - .005] *.065 * C, where

A = the amount subject to the Market Value Adjustment.

B = the crediting yield on the date the Premium Payment was allocated to the strategy minus the crediting yield on the date of the Access.

C = 120 minus the number of months since the Premium Payment was allocated to the strategy, but not less than 60.

Friedman Decl. Ex. A at ANICO-RAND 073628; Ex. B at ANICO-RAND 073677.  The "B" factor in this formula – "[B - .005]" – is the 50 bp bias.

Plaintiff asserts that not only is the MVA not disclosed as an "associated penalty," but that the algebraic description of the MVA is completely incomprehensible to consumers, and that consumers would not understand from the information contained in the policy that a 50 bp "bias" is assessed whenever a policyholder surrenders their annuity or withdraws more than the allowable 10% penalty-free amount during the 10 year surrender period.  Plaintiff contends that the 50 bp "bias" operates as an additional, undisclosed surrender charge that ANICO imposes on top of the surrender charges disclosed in the surrender charge schedule.  Plaintiff argues that just like the disclosed "surrender charge," the 50 bp bias reduces the cash surrender values paid to policyholders upon early surrenders or withdrawals, and just like a surrender charge, the MVA with its 50 bp bias is only applied during the surrender period. As support, plaintiff cites, *inter alia*, the deposition testimony of Mr. Hemme.  At his deposition, Mr. Hemme testified,

Q:   And in fact looking at the 50 basis point bias component of the market value adjustment, that component operates in the same fashion as the surrender charge; correct?

A:   Well, if you – if you mean by that that it reduces the – what is payable to the policyholder, yes.

. . .

Q:   And so the effect of including the 50 basis point bias is to increase the otherwise stated surrender charge by an amount ranging from between 1.95 percent and 3.12 percent depending upon the year during the surrender charge occurs;

1    correct?

2    A:    It has the – that impact, yes.

3    . . .

4    Q:    You could mathematically achieve the same result by taking the 50 basis point
           bias and moving [it] into the surrender charge increasing the surrender charge by
5          the applicable percentage; couldn't you?

6    A:    Yes.

7    Q:    There is no difference from the perspective of the policyholder, the effect on the
           surrender values; is there?

8    A:    No, no.

9    Friedman Decl. Ex. C (Hemme Depo. at 87:15-22).[7]

10        Defendant opposes plaintiff's motion for partial summary judgment, and has filed a cross-motion

11   for summary judgment seeking a ruling that ANICO did not violate § 10127.13 because the MVA is not

12   a "surrender charge" or an "associated penalty."   As an initial matter, defendant asserts that the

13   California Department of Insurance reviewed and approved the BenchMark Reliance product both in

14   2003 and in 2007, and thus the disclosures are presumptively valid.  Plaintiff responds that ANICO has

15   mischaracterized the nature of the CDI's review of the BenchMark products, and that in any event the

16   Court, and not the Insurance Commissioner, is the final arbiter of defendant's liability.  Plaintiff asserts

17   that the CDI operates pursuant to statutory authority granted to it by the California Legislature, and that

18   while the CDI is responsible for ensuring that an insurer files the proper paperwork before issuing any

19   policies, the CDI does not have the authority to evaluate and approve the content of pre-filed forms.  *See*

20   Cal. Ins. Code § 10168.93(b) ("nothing in this section shall be construed as requiring or providing for

21   the prior approval by the commissioner of forms of individual annuity contracts prior to the time the

22   forms are marketed, issued, delivered, or used in this state."); Cal. Ins. Code § 10191 ("the commissions

23   . . . may establish and maintain a procedure for the filing and approval of documents, as defined in this

24   section, prior to their issuance, delivery, or use in this state.").  Moreover, plaintiff contends that even

25   if the CDI had the authority to approve the content of ANICO's policies, such approval does not prevent

26

27   _____

28        [7] *See also id.* at 102:22-104:4.  Defendant objects to this testimony as ambiguous, assumes facts
     not in evidence, compound and confusing.  The Court OVERRULES these objections.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    a court from finding that the policies violate the law.

2         The Court concludes that the CDI's review of the policies at issue neither establishes ANICO's

3    compliance with the Insurance Code, nor precludes this Court from determining whether ANICO

4    violated the disclosure requirements.[8]  A number of courts have agreed.  *See Troyk v. Farmers Group,*

5    *Inc.*, 171 Cal. App. 4th 1305, 1328 (2009) ("In any event, the DOI's purported past practices do not

6    control our de novo determination of the question of law on the meaning of the term 'premium,' as used

7    in section 381, subdivision (f)."); *Reichart v. Life Ins. Co. of N. America*, 485 F. Supp. 56, 64 (N.D. Cal.

8    1979) ("The Commissioner's approval of a policy form in the abstract does not preclude a California

9    court . . . from finding that such policy violates the law); *Frenzer v. Mut. Ben. Health & Accid. Ass'n*,

10   27 Cal. App. 2d 406, 414 (1938) ("Regardless of the fact that this particular provision and the policy

11   itself was approved by the state insurance department [that] does not prevent us from considering the

12   matter, and stating that in our opinion the policy is misleading and does not conform to the requirements

13   of the Insurance Act."); *see also Estate of Migliaccio v. Midland Nat. Life Ins. Co.*, 436 F. Supp. 2d

14   1095, 1105-06 (C.D. Cal. 2006) (rejecting argument that CDI had exclusive jurisdiction over non-

15   disclosure claims related to deferred annuities); *Iorio v. Allianz Life Ins. Co. of N. Am.*, No. C 05-CV-

16   0633, slip. op. at 9-10 (S.D. Cal. July 8, 2008) (Supp. Friedman Decl. Ex. D).  Defendant has not cited

17   any authority to the contrary.

18        Defendant next contends that the plain language of § 10127.13 does not require disclosure of

19   the MVA because the statute requires disclosure of the "surrender *period* and all associated penalties,"

20   and not the "surrender *charges* and all associated penalties."  Under defendant's interpretation, the

21   statute only requires disclosure of the surrender period and associated "surrender charges," and,

22   according to defendant, the MVA cannot be characterized as a "surrender charge" because the MVA

23   and the surrender charge are distinct policy features.  According to defendant, the MVA is designed to

24   provide the annuitant a benefit caused by a reduction in interest rates or to recover from the annuitant

25   costs that occur when an annuitant withdraws more than 10% of their money early due to an increase

26

27        ────────────────────────

        [8]  As such, the Court finds it unnecessary to resolve the parties' factual disputes regarding the
28   scope of CDI's review of the Benchmark policies, as well as the parties' evidentiary objections to the
     declarations and documents both parties have submitted regarding the CDI's review of the policies.

in interest rates.  *See* Hemme Decl. ¶ 5; Hernandez Decl. ¶ 22.  Defendant asserts that while the MVA fluctuates with the market and the timing of any withdrawal, the surrender charge schedule consists of a set percentage of reduction in account value due to a withdrawal of more than 10% of the cash value in a year.  *Id.*  In addition, defendant notes that the MVA does not apply to every BenchMark Reliance policy, and only applies when a policyholder elects an "Index 10-Year Treasure" or "Index Corporate Bond" strategy, and thus there is no way to add the MVA to the surrender charge schedule.  *Id.*

Defendant's argument is not supported by the language of the statute.  Section 10127.13 is not limited to those penalties that ANICO chooses to label as a "surrender charge."  To the contrary, the statute expressly provides that whenever a senior annuity contains a "surrender charge period" the insurance company must disclose or reference on the cover page or the policy jacket "the surrender period and *all associated penalties*."  Cal. Ins. Code § 10127.13.  Rather than simply requiring disclosure of "all surrender charges," the statute requires disclosure of "all" "penalties" "associated" with the surrender period, which is broader than simply requiring disclosure of surrender charges.  The testimony of ANICO's own witnesses demonstrates that, regardless of how ANICO chooses to label the MVA, the MVA operates as a penalty because it reduces or forfeits a portion of the BenchMark Reliance account value in connection with any early surrender that exceeds the penalty-free amount. The MVA, with its 50 bp bias, is "associated" with the surrender period because the MVA applies only during the surrender period stated in the contract.

The evidence shows that the deductions resulting from the MVA adjustment fit the definition of "surrender charge" contained in the Benchmark Reliance annuities.  The annuities define "Surrender Charge" as "the amount the Company may charge for a Surrender or Withdrawal and is based on the number of years since the Premium Payment was received."  Friedman Decl. Ex. A at ANICO-RAND-073623; Ex. B at ANICO-RAND-073672.   ANICO's actuarial expert, Timothy Pfeifer, testified that the "bias factor" contained in the Benchmark Reliance annuities met his own definition of "penalty" because it causes a reduction in the cash values paid upon an early withdrawal.  Supp. Friedman Decl. Ex. E (Pfeifer Depo. at 70:2-71:5).  Both Mr. Hemme and Mr. Pfeifer testified that the MVA "bias factor" operates to reduce the amount otherwise payable to the policyholder upon early surrender.  Friedman Decl. Ex. C. (Hemme Depo. at 85:4-87:14, 102:21-104:4); Friedman Supp. Decl. Ex. E

United States District Court
For the Northern District of California

(Pfeifer Depo. at 30:17-31:9). For example, Mr. Pfeifer testified that "The bias factor – if the MVA is applicable at all – the bias factor or the factor, as we refer to it here, does result in a lower policyholder value." Pfeifer Depo. at 31:7-9. The MVA is applicable whenever a policyholder surrenders or withdraws more than 10% of the annuity value during the surrender period. The Court concludes that because the MVA bias factor reduces the cash surrender values paid to policyholders upon early surrenders or withdrawals during the surrender period, the MVA should have been disclosed as an "associated penalty" as required by Insurance Code Section 10127.13.

ANICO's overly narrow reading of § 10127.13 would render the phrase "all associated penalties" meaningless surplusage in violation of accepted canons of statutory interpretation, which is particularly inappropriate given the remedial purpose for which the statute was adopted: to protect vulnerable seniors through mandatory language stated "clearly" in "bold, 12-point print on the cover page of the policy." *See Westinghouse Elec. Corp. v. Pacific Gas & Elec. Co.*, 326 F.2d 575, 580 (9th Cir. 1964) ("Remedial statutes should be liberally construed and should be interpreted (when that is possible) in a manner tending to discourage attempted evasions by wrongdoers."); *Leader v. Cords*, 182 Cal. App. 4th 1588, 1598 (2010) ("A remedial statute 'must be liberally construed to effectuate its object and purpose, and to suppress the mischief at which it is directed.") (internal citations omitted).[9]

Accordingly, the Court GRANTS plaintiff's motion for partial summary judgment and DENIES defendant's motion for partial summary judgment.

### B.   "Death benefit" and surrender charge

When the owner of a BenchMark Reliance annuity dies during the surrender period, the "Death Benefit" paid to the beneficiary is reduced by the applicable surrender charge percentage. Plaintiff contends that Insurance Code Section 10127.13 requires ANICO to disclose the death-related surrender charges on the cover sheet of the Benchmark Reliance annuities or in the surrender charge schedule on the "Data Page" referenced in the stamp affixed to the policy jacket.

It is undisputed that there is no mention of the death-related surrender charges on the cover sheet

---

[9] Without objection, plaintiff has filed a copy of the Senate Final History of Insurance Code Section 10127.13. Friedman Decl. Ex. F.

or in the surrender charge schedule.  The surrender charge schedule states that "If a Withdrawal exceeds the Surrender Charge Free Withdrawal Percentage of the Annuity Cash Value in any Policy Year, the amount of the excess Withdrawal will be assessed a Surrender Charge as follows: [schedule]." Friedman Decl. Ex. A at ANICO-RAND-073621; Ex. B at ANICO-RAND-073670.   A "Withdrawal" is defined as "a portion of the Annuity Cash Value withdrawn on or before the Maturity Date and paid to the Owner."  Friedman Decl. Ex. A at ANICO-RAND 073623; Ex. B at ANICO-RAND-073672. Thus, based solely on the language contained on Page 4 of the policy, a policyholder would not know that a surrender charge is assessed when the policyholder dies because a death benefit payment is not "withdrawn" from the account value nor is it paid to the "owner."

Instead, in order to discover the death penalty surrender charge, a policyholder would need to look at (1) the "Death Benefit" provision on page 8 of the policy; (2) the definition of "Surrender Value" on page 6 of the policy; and (3) the surrender charge schedule on page 4 of the policy.  Friedman Decl. Ex. C (Hemme Depo. at 141:15-142:6.)

The "Death Benefit" provision states, in relevant part,

**Death Benefit**

The Death Benefit is the greater of

• Surrender Value; or

• Return of All Premium Payments, less Withdrawals and Monthly Deductions, if applicable.

. . .

Friedman Decl. Ex. A at ANICO-RAND-073625; Ex. B at ANICO-RAND-073674. "Surrender Value," in turn, is defined as,

[T]he amount payable upon Surrender of this Policy.  It is equal to the greater of: a) the Minimum Guaranteed Surrender Value; or b) the Annuity Cash Value less any applicable Surrender Charge, adjusted for any applicable Retroactive Interest Adjustment and Market Value Adjustment.

Friedman Decl. Ex. A at ANICO-RAND-073623; Ex. B. at ANICO-RAND-073672.

Defendant argues that Section 10127.13 only requires disclosure of the surrender period and associated penalties or the location of surrender information, and that this section "does not remotely

imply that a company has to attempt to outline each event upon which surrender values are paid. Creating the ridiculous obligation that Plaintiff claims exists would be tantamount to requiring an insurer to put the entire contents of the policy on half a page." Defendant's Reply at 22:12-16. Defendant's argument is not well-founded. Compliance with the statute is not excused simply because the required disclosures can be lengthy. Moreover, in the event the disclosures are lengthy, an insurance company can comply with the statute by disclosing "the location of surrender information" rather than the "surrender period and all associated penalties."

As with the MVA, defendant argues that it was not required to disclose the death-related surrender charge because the CDI approved the BenchMark Reliance annuities, and because the CDI Annuity Policy Form Filing Questionnaire differentiates between Insurance Code Section 10127.10 and 10127.13 disclosure requirements and questions about Death Benefit provisions. As discussed *supra*, the Court holds that CDI's approval of the BenchMark Reliance annuities does not preclude a judicial determination that defendant did not comply with the disclosure requirements set forth in the Insurance Code.

Citing the declaration of Gary Hernandez, defendant asserts that it was not required to disclose the death-related surrender charge because the charge is not applied to the annuitant but to the beneficiaries of the annuitant. *See* Hernandez Decl. ¶ 31. However, as discussed *supra*, the statute requires disclosure of the "surrender period and *all associated penalties*." The statute does not distinguish between penalties assessed against the annuitant versus penalties assessed against the beneficiary, and instead is broadly written to include "all" "penalties" "associated" with the surrender period. It is undisputed that when a policyholder dies during the surrender period, ANICO assesses the "surrender charge" set forth in the surrender charge schedule when making the death benefit payment, and this charge results in a reduction in the Death Benefit. Moreover, the policies do not define "Surrender Charge" as only charges that are assessed against the annuitant, and instead "Surrender Charge" is defined as "the amount the Company may charge for a Surrender or Withdrawal and is based on the number of years since the Premium Payment was received." Friedman Decl. Ex. A at ANICO-RAND-073623; Ex. B at ANICO-RAND-073672. Defendant has not articulated any cogent explanation for treating the death-related surrender charge differently than other surrender charges for

13

**United States District Court**
For the Northern District of California

purposes of the disclosure requirements.  Accordingly, the Court concludes that defendant violated Section 10127.13 by not disclosing this charge, and GRANTS plaintiff's motion for partial summary judgment and DENIES defendant's motion for partial summary judgment.

**C.     Placement of the notice and disclosure of the location of the surrender period information**

**1.     Placement**

Plaintiff contends that ANICO violated Section 10127.13 by placing the surrender notice on the inside of the policy jacket, rather than on the outside of the policy jacket.  The statute provides,

> All individual life insurance policies and individual annuity contracts for senior citizens that contain a surrender charge period shall either disclose the surrender period and all associated penalties in 12-point bold print on the cover sheet of the policy or disclose the location of the surrender information in bold 12-point print on the cover page of the policy, or printed on a sticker that is affixed to the cover page or to the policy jacket. The notice required by this section may appear on a cover sheet that also contains the disclosure required by subdivision (d) of Section 10127.10.

Cal. Ins. Code § 10127.13.

Defendant responds that ANICO complied with the statute because the company "disclosed the location of the surrender information" in the appropriate font "printed on a sticker affixed to the policy jacket."  Defendant argues that there is no requirement in the statute that the sticker be placed on the outside of the policy jacket.  Defendant also states that the policy jacket stands out from the other documents that were given to Rand because it is a folder made of cardstock and it is what actually holds the policy together.  Plaintiff concedes that the plain language of the statute does not specify that the sticker can only be placed on the outside of the policy jacket.  However, plaintiff argues that the statute "makes clear that the notice must be placed on the outside of the policy jacket [because] the statute uses the term 'cover' on four separate occasions when stating where the insurer must disclose the applicable surrender penalties."  Pl's Reply at 10:4-6.

"[S]tatutory interpretation begins with the plain language of the statute."  *United States v. Chaney*, 581 F.3d 1123, 1126 (9th Cir. 2009) (brackets and internal quotation marks omitted).  The statute does not specify that the sticker must be placed on the outside of the policy jacket.  Although the statute repeatedly uses the word "cover," the statute states that an insurance company may comply with

1   the disclosure requirements by printing the location of surrender information on "a sticker that is affixed

2   to the cover page *or to the policy jacket*."  Here, "cover" modifies "page," and not "policy jacket."  The

3   Court agrees with defendant that ANICO complied with the letter of the statute by placing the sticker

4   on the inside of the policy jacket.  The Court DENIES plaintiff's partial motion for summary judgment

5   on this aspect of the UCL claim and GRANTS defendant's cross-motion on this point.

6

7                    **2.        Disclosure of location surrender charge information**

8           Plaintiff also contends that ANICO violated the statute because neither the policy jacket nor the

9   cover accurately disclosed the location of the surrender information.  The stamp states, in relevant part,

10          **THIS POLICY HAS SURRENDER CHARGES FOR THE YEARS SHOWN ON
          THE POLICY'S DATA PAGE.  THE SURRENDER CHARGE FACTORS ARE**

11          **ALSO SHOWN ON THE POLICY'S DATA PAGE.  YOU MAY ALSO REFER
          TO THE SURRENDER CHARGE PROVISION IN THE POLICY FOR**

12          **INFORMATION REGARDING THE SURRENDER CHARGE.**

13  Friedman Decl. Ex. A at ANICO-RAND-073602; Ex. B at ANICO-RAND-073647.  Plaintiff argues

14  that this disclosure is inadequate because the stamp does not list the page number of the "Data Page,"

15  nor does it list the page number for the table of contents.  Instead, to locate the "Data Page," the

16  policyholder must search the entire contract or find the table of contents, which lists the "Data Page."

17  Defendant argues that the policy need not disclose the specific page number in order to "disclose the

18  location of the surrender information."  Here, the stamp discloses the location of the surrender

19  information by directing policyholders to the policy's "Data Page" and the "Surrender Charge"

20  provision.

21          However, plaintiff asserts that even if a policyholder locates the "Data Page," she will not be

22  able to easily locate the actual page containing the surrender information because the table of contents

23  states that the "Data Page" is found on page 2, while the relevant surrender penalty information is

24  located on page 4, which is not labeled as "data page."  *See* Friedman Decl. Ex. A at ANICO-RAND

25  073619-07321; Ex. B at ANICO-RAND 073668-073670.  Defendant agrees that the page containing

26  the relevant surrender information is page 4 of the policy.  Def's Reply at 11:6.  Pages 2 and 3 of the

27  policy are titled "Data Page" and contain information about the specific annuity purchased by the

28  policyholder, such as the policy number, issue age of the annuitant, date of issue, premium payment (all

on page 2), as well as a chart showing, for each of the 20 years of the annuity, the annuitant's age, the projected annuity cash value, projected surrender value, minimum guaranteed annuity cash value, and minimum guaranteed surrender value (all on page 3). The Surrender Charge schedule, which shows the surrender period and the surrender charge percentage that is assessed if a withdrawal exceeds the surrender charge free withdrawal percentage during the surrender period, is contained on page 4.

Defendant contends that the policy disclosed the location of the surrender information found on page 4 because "the Cover Page index informs the policyholder that the Data Page begins on page two and continues through page 4." *Id.* at 11:4-5. As support, defendant cites the deposition testimony of Christina Eaken, the Vice-President of Compliance for Legacy Marketing Group. Ms. Eaken testified as follows,

> Q:   Okay. Can you tell me, looking at the table of contents here on 073618, what page the data page information is located?
>
> A:   It appears that data page begins on page 2.
>
> Q:   Okay. Can you turn to page 2 of the policy, please? And that's Bates stamped 073619; correct?
>
> A:   Yes.
>
> Q:   And if you look at the data page, is there anything on that page that, actually sets forth what the surrender charges are?
>
> A:   Not on that page. There is on page 3 a doc – it's, also, labeled data page, and then page 4.
>
> Q:   Going back to the table of contents, does that table of contents mention pages 3 or 4 as pages that refer to the data page?
>
> A:   Well, it doesn't list anything else until page 5.
>
> Q:   So does the data page mention pages 3 or 4?
>
> A:   Well, it's somewhat implied that the data page would be pages 2 through 4, because the next section is definitions and that starts on page 5.
>
> Q:   Does it say that?
>
> A:   I don't know that it specifically says that, but I think general table of contents rules would imply that.

Clarke Decl. Ex. A (Eaken Depo. at 84:16-85:18).

The Court finds that the disclosure here was inadequate because the stamp does not direct

policyholders to the "location of the surrender information."  The stamp states that "THIS POLICY HAS SURRENDER CHARGES FOR THE YEARS SHOWN ON THE POLICY'S DATA PAGE" and "THE SURRENDER CHARGE FACTORS ARE ALSO SHOWN ON THE POLICY'S DATA PAGE." However, the "Data Page" identified in the table of contents as appearing on page 2 of the policy does not contain this information.  Nor does the "Data Page" on page 3 of the policy contain this information. Instead, the relevant surrender information is located on page 4, which is not labeled as a "data page." Even if defendant is correct that page 4 should be considered part of the "Data Page" that fact is not obvious in any way, and a policyholder should not be required to discern that fact by implication from the table of contents.

Defendant also contends that it disclosed the surrender information on the cover page (and table of contents) because the that page states that the surrender information can be located on pages 12 and 13 of the policy.  However, this argument is without merit because, as defendant has conceded, the relevant surrender information is found on page 4 of the policy.  Pages 12 and 13 of the policy contain definitions of the terms "surrender" and "surrender charge" and do not disclose the "surrender period and all associated penalties."  Instead, the surrender period and schedule of surrender charges are found on page 4, which is not referenced in the table of contents located on the cover page.

Accordingly, the Court GRANTS plaintiff's motion for partial summary judgment on this issue and DENIES defendant's motion for partial summary judgment on this issue.

### D.      Constitutional vagueness and substantial compliance

In its reply, defendant raises several additional arguments regarding the Section 10127.13 claims. Defendant argues that nothing in Section 10127.13 "remotely suggests" that the MVA and the death-related surrender charge should be disclosed, and that plaintiff's interpretation would render the statute constitutionally vague.  The Ninth Circuit has held that when considering whether a statute is vague, "laws that regulate economic activity not involving constitutionally protected conduct are subject to a quite lenient test for constitutional sufficiency."  *In re Kelly*, 841 F.2d 908, 915 (9th Cir. 1988).  The Court finds that defendant's vagueness argument lacks merit.  Section 10127.13 requires ANICO to disclose "the surrender period and all associated penalties."  For all of the reasons discussed *supra*, the

MVA and the death-related surrender charge penalize policyholders for early surrender or withdrawal during the surrender period, and thus these charges constitute "penalties" that are "associated" with the surrender period.

Defendant also argues that if the Court finds that ANICO did not comply with the disclosure requirements, it "substantially complied" because the disclosures provided Rand with all of the necessary information regarding the surrender period and the surrender amount. The Court disagrees. As an initial matter, "the doctrine of substantial compliance does not apply at all when a statute's requirements are mandatory, instead of merely directory." *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1333 (2009). In *Troyk*, the California Court of Appeal rejected an insurance company's argument that it substantially complied with the disclosure requirements of Cal. Ins. Code Section 381, which requires that an insurance policy "shall" state the premium for insurance coverage.

> As we discussed above, that statute is a consumer protection statute. Therefore, it requires an express statement in an insurance policy of the premium charged by an insurer and does so presumably to protect consumers from confusion regarding the premium charged and to discourage insurers from misleading consumers regarding the amount of premium charged. Furthermore, that express statement of premium in a policy allows a consumer to easily compare that premium with premiums charged by other insurers for the same coverage, thereby promoting healthy comparison-shopping by consumers and presumably encouraging insurers to offer competitive premiums for their insurance. Were insurers allowed, by substantial compliance or otherwise, to state all or part of a premium in documents other than a policy, those underlying purposes of section 381, subdivision (f), would not be promoted.

*Id*. Like the disclosure statute in *Troyk*, Section 10127.13 is framed in mandatory language and states that annuities "shall" disclose the surrender period and all associated penalties or disclose the location of the surrender information. The Court finds that the doctrine of substantial compliance does not apply to the disclosures required by this section.

Moreover, even if the Section 10127.13 disclosures were not mandatory, defendant has not shown that it substantially complied because "[s]ubstantial compliance, as the phrase is used in the decisions, means actual compliance in respect to the substance essential to every reasonable objective of the statute." *Id*. (internal citations and quotation omitted). For the reasons discussed *supra*, the violations that the Court has found cannot be characterized as non-substantive or mere technicalities.

**II.     California Insurance Code § 10127.10**

Plaintiff alleges that the Benchmark Reliance Annuities fail to comply with California Insurance Code Section 10127.10, titled " Individual life insurance; investment of variable annuity premiums; individual annuity insurance; senior citizens; notice; cancellation; refunds; application." Subsection (a) of that statute requires every annuity contract delivered or issued for delivery to a senior citizen in California after July 1, 2004 to have a notice stating that the policy may be returned by the owner during a 30-day cancellation period.  Cal. Ins. Code § 10127.10(a).  In addition, subsection (c) provides,

> (c) Every individual life insurance policy and every individual annuity contract, other than variable contracts and modified guaranteed contracts, subject to this section, that is delivered or issued for delivery in this state shall have the following notice either printed on the cover page or policy jacket in 12-point bold print with one inch of space on all sides or printed on a sticker that is affixed to the cover page or policy jacket:
>
> "IMPORTANT
>
> YOU HAVE PURCHASED A LIFE INSURANCE POLICY OR ANNUITY CONTRACT. CAREFULLY REVIEW IT FOR LIMITATIONS.
>
> THIS POLICY MAY BE RETURNED WITHIN 30 DAYS FROM THE DATE YOU RECEIVED IT FOR A FULL REFUND BY RETURNING IT TO THE INSURANCE COMPANY OR AGENT WHO SOLD YOU THIS POLICY. AFTER 30 DAYS, CANCELLATION MAY RESULT IN A SUBSTANTIAL PENALTY, KNOWN AS A SURRENDER CHARGE."

The phrase "after 30 days, cancellation may result in a substantial penalty, known as a surrender charge" may be deleted if the policy does not contain those charges or penalties.

Cal. Ins. Code § 10127.10(c).

The parties' dispute centers on the location of the notices contained in the annuity policies purchased by Rand; there is no dispute that the language of the notices complies with the requirements of subsection (c).  As with the surrender information notice discussed *supra*, the Section 10127.10 notices were not stamped on the front page of the policy jacket, and instead were located on the inside cover of the policy jacket.  ANICO contends that the plain language of the statute requires that the notice be "printed on the cover page or policy jacket," and that it complied with the statute by placing the notice on the inside of the policy jacket.  Plaintiff contends that "the intent of the statute is to provide seniors with clear, conspicuous and prominently displayed information regarding their right to cancel the insurance or annuity policy within 30 days of purchase," and that by "hiding" the notice on the inside of the policy jacket, ANICO did not comply with the intention of the statute.  Plaintiff's Reply

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

at 13:6-9.  Plaintiff also notes that ANICO changed its policy in March 2010 and now stamps the disclosure notice on the front cover of the policy jacket.

The Court finds that defendant complied with Section 10127.10 because the plain language of the statute requires that the notice be printed on the "cover page or policy jacket."  Plaintiff does not cite any authority for the proposition that an insurance company violates § 10127.10(c) by placing the notice on the inside of the policy jacket, and plaintiff's intent argument implicitly concedes that ANICO has complied with the letter of the statute.  The Court finds that ANICO complied with this statute, and DENIES plaintiff's motion for partial summary judgment and GRANTS defendant's motion for partial summary judgment on this aspect of the UCL claim.

## III.  California Insurance Code § 10509.4

The complaint alleges that ANICO violated California Insurance Code Section 10509.4, and that this violation serves as a predicate for the UCL claim.  Compl. ¶ 66(b),(h).  Section 10509.4 addresses disclosures when replacement policies are involved.  Rand's purchase of annuity policy LAR0074360 involved the replacement of an existing annuity she had purchased from another insurer.

Section 10509.4, titled "Duties of agents accepting applications; statements; notice regarding replacement of life insurance" provides:

> (a) Each agent who accepts an application shall submit to the insurer with which an application for life insurance or annuity is presented, or as part of each application, both of the following:
>
> > (1) A statement signed by the applicant as to whether replacement of existing life insurance or annuity is involved in the transaction.
> >
> > (2) A signed statement as to whether or not the agent knows replacement is or may be involved in the transaction.
>
> (b) Where a replacement is involved, the agent shall do all of the following:
>
> > (1) Present to the applicant, not later than at the time of taking the application, a "Notice Regarding Replacement of Life Insurance" in the form as described in subdivision (d).  The notice shall be signed by both the applicant and the agent and left with the applicant.  Obtain with or as part of each application a list of all existing life insurance or annuities to be replaced and properly identified by name of insurer, the insured and contract number.  If a contract number has not been assigned by the existing insurer, alternative identification, such as an application or receipt number, shall be listed.

(2) Leave with the applicant the original or a copy of all printed communications used for presentation to the applicant.

(3) Submit to the replacing insurer with the application a copy of the replacement notice.

(c) Every agent who uses written or printed communications in conservation[10] shall leave with the applicant the originals of any materials used.

(d) Each agent or broker shall present to an applicant the following notice:

**NOTICE REGARDING REPLACEMENT**

**REPLACING YOUR LIFE INSURANCE POLICY OR ANNUITY?**

**Are you thinking about buying a new life insurance policy or annuity and discontinuing or changing an existing one? If you are, your decision could be a good one--or a mistake. You will not know for sure unless you make a careful comparison of your existing benefits and the proposed benefits.**

**Make sure you understand the facts. You should ask the company or agent that sold you your existing policy to give you information about it.**

**Hear both sides before you decide. This way you can be sure you are making a decision that is in your best interest.**

**We are required by law to notify your existing company that you may be replacing their policy.**

_____ _____ _____
**(applicant) (agent) (date)**

Cal. Ins. Code § 101509.4.

Defendant contends that it complied with Section 10509.4(a)(1)-(2) because (1) Rand's application includes a statement that the annuity will replace another annuity, (2) Rand signed the application, including the statement that the annuity would be a replacement, and (3) Rand's insurance agent signed the application indicating that the annuity would be a replacement. Corrected Eaken Decl. Ex. 2 at ANICO-RAND 073688. The page of the annuity application cited by ANICO states that the annuity will replace an annuity or insurance, and contains the signatures of both Rand and the agent. Accordingly, the Court finds that ANICO complied with Section 10509.4(a)(1)-(2).

Defendant contends that it complied with subsection (b) because ANICO provided Rand with

---

[10]  "'Conservation' means any attempt by the existing insurer or its agent to dissuade a policyowner from the replacement of existing life insurance or annuity. Conservation does not include routine administrative procedures such as late payment reminders, late payment offers, or reinstatement offers." Cal. Ins. Code § 10509.2(b).

United States District Court
For the Northern District of California

the required notice regarding placement policies, Rand received the notice specified in the statute, and Rand certified that she received the notice by signing the document. ANICO has filed a copy of the Notice Regarding Replacement that contains the language required by subsection (d) of the statute, and that is signed by both Rand and her agent. Original Eaken Decl. Ex. 3. Plaintiff responds that defendant has only shown that it complied with the requirement of subsection (b) that ANICO present a copy of the Notice Regarding Replacement to Rand, and that ANICO has not submitted any evidence showing that it complied with the other requirements of the statute, namely that the agent left Rand the original or copy of all printed communications used for presentation to Rand (§ 10509.4(b)(2)), or that the agent left with Rand the originals of any materials used (§ 10509.4(c)).

The parties have filed cross-motions for summary judgment on this claim, and plaintiff is correct that the record does not contain any evidence about whether ANICO complied with the other requirements set forth in Section 10509(b) or (c). At the hearing plaintiff's counsel suggested that plaintiff could obtain evidence relevant to this claim. On this record, the Court finds it appropriate to GRANT defendant's motion for partial summary judgment as to Section 10509.4(a) and the presentation requirement contained in subsection (b)(1), and to DENY the parties' cross-motions as to the balance of that statute. The parties may renew their motions on a fuller factual record. However, as plaintiff bears the burden of proof on this claim, if ultimately plaintiff is not able to submit any evidence on this point, defendant will be entitled to summary judgment. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

## IV.    California Insurance Code § 789.8

The complaint also alleges that ANICO violated California Insurance Code Section 789.8, which requires the inclusion of specified policy language regarding the possibility of tax consequences, early withdrawal penalties, or other costs or penalties, resulting from the sale or liquidation of a stock, bond, IRA, or similar investment to fund the purchase of a new annuity.

Defendant has moved for summary judgment on this claim, and submitted evidence showing that ANICO complied with Section 789.8. In response, plaintiff has withdrawn her claim that the alleged violation of Section 789.8 constitutes a predicate violation of the UCL. Accordingly, the Court

GRANTS defendant's motion for summary judgment on this aspect of plaintiff's UCL claim.

## CONCLUSION

For the foregoing reasons defendant's motion for summary judgment is GRANTED in part and DENIED in part and plaintiff's motion for summary judgment is GRANTED in part and DENIED in part.  (Docket Nos. 89 & 147).

**IT IS SO ORDERED.**

Dated: September 29, 2010

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California